764 A.2d 270

**Charles S. SHAPIRO et al.**

v.

**Marvin GREENFIELD et al.**

**Nos. 6195, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Nov. 1, 2000.

Reconsideration Denied Jan. 31, 2001.

**4**

David Ober (William O. Bittman, Reed, Smith, Shaw & McClay, LLP, Washington, DC, and Ira C. Wolpert, Bethesda), for appellants.

D. Christopher Ohly (Roberta Klienast Daghir, John E. Lucian and Blank, Rowe, Comisky & McCauley, LLP, on the brief), Baltimore, for appellees.

Argued before MOYLAN, EYLER and KENNEY, JJ.

KENNEY, Judge.

This appeal arises out of a derivative suit brought by minority shareholders, Marvin and Betty Greenfield (appellees), against, among others, College Park Woods, Inc. ("College Park") and its officers and directors (appellants), alleging usurpation of a corporate opportunity of College Park and seeking an accounting and dissolution of the corporation. By order dated February 23, 1998, the trial court found that the disputed transaction constituted usurpation of corporate opportunity, that there were no disinterested directors, and that the transaction was not fair and reasonable to the corporation. The trial court appointed a single receiver for College Park. Appellants filed a timely notice of appeal and present three issues, which we have re-numbered as follows:

I.    Whether the trial court's ruling that the Clinton Crossings Shopping Center was a corporate opportunity of College Park was clearly erroneous?

II.    Whether the trial court erred in appointing a receiver to assume control of a corporation when the trial court did not make the statutorily required findings of illegal, oppressive, or fraudulent conduct by the corporation's directors?

III.    Whether the trial court erred in not finding that shareholder plaintiffs estopped from challenging a corporate act where shareholder plaintiffs, after being duly notified, elected not to attend the shareholders' meeting where the corporate act was voted upon?

## FACTUAL BACKGROUND

Charles Shapiro was the operating officer for College Park during the relevant time period.  Other officers and directors included Joan Smith, Charles' sister, and Michael Shapiro, Charles' son.[1]  Appellee Marvin Greenfield is Charles Shapiro's cousin.

In 1961, College Park acquired approximately 68 acres of land in Prince George's County, on which it constructed the 72,000 square foot Clinton Plaza shopping center.  By 1991, Clinton Plaza was only 50% leased and generating insufficient cash flow.  It was decided that the best use of the land was not the continuation of Clinton Plaza, but redevelopment of the property into a substantially larger shopping center. Having determined that College Park was not capable of redeveloping Clinton Plaza on its own, the directors explored suitable partnerships or joint ventures, but for some time did not find any.

Charles Shapiro, the operating officer of College Park, subsequently developed a joint venture with S. Bruce Jaffe, an occasional business partner of his with experience developing retail space.  The joint venture required the creation of three entities:  1) Clinton Crossings Limited Partnership ("Clinton Crossings Partnership"), which was to own the redeveloped Clinton Plaza shopping center;  2) Clinton Crossings, Inc., which was to be a one percent owner and the general partner

---

1.    Appellants include Joan Smith and Michael Shapiro.

of Clinton Crossings Partnership;[2] and 3) TSC/Clinton Associates Limited Partnership ("Clinton Associates"), which was to own forty-nine percent of Clinton Crossings Partnership.[3] College Park was to transfer its fee simple interest in Clinton Plaza to Clinton Crossings Partnership in exchange for a fifty percent limited partnership interest in Clinton Crossings Partnership, the owner of the redeveloped center. Clinton Associates was to contribute everything necessary for the shopping center's redevelopment with the exception of the land.

As a limited partner, College Park would have no rights to manage, direct or control the affairs of Clinton Crossings Partnership. Clinton Crossings Partnership and Clinton Associates, on the other hand, would assume the risk associated with the redevelopment, while College Park would assume none. Moreover, College Park would not be obligated to transfer its interest in Clinton Plaza until Clinton Associates had obtained a construction loan, pre-leased at least eighty percent of Phase I space, and obtained a debt coverage ratio of 1 to 1. The agreement further provided that, if Phase II of the development was not completed within five years, any unused portion of the land would revert to College Park. A capital account in Clinton Crossings Partnership was to be established for College Park, in the amount of $4.00 per square foot for land used in the redevelopment. With Phase I expected to utilize 36 acres, College Park's capital account was funded at $6,272,640.

On October 26, 1991, a special meeting of College Park's shareholders was called for the purpose of "considering and approving a resolution authorizing the corporation to enter into a limited partnership agreement with Clinton Crossings, Inc., ... and TSC/Clinton Associates Limited Partnership ..." Advance notice of the meeting included documents that

---

2. Charles Shapiro was to own all the stock of Clinton Crossings, Inc.

3. Clinton Associates was to be owned by Clinton Crossings, Inc., Charles Shapiro, S. Bruce Jaffe, and Michael Mates.

described the joint venture in detail. The notice also provided:

> The transaction to be considered at the Special Meeting is an interested director transaction within the meaning of Section 2-419 of the Corporations and Associations Article of the Code of Maryland because (i) Charles S. Shapiro and Michael Shapiro are each directors of the Corporation, (ii) Charles S. Shapiro is the sole shareholder of Clinton Crossings, Inc., and (iii) it is expected that Charles S. Shapiro and Michael Shapiro will each have an interest, directly or indirectly, as a limited partner in TSC/Clinton Associates Limited Partnership.

Appellees, Marvin and Betty Greenfield did not attend this special meeting.[4] At the meeting, the shareholders present unanimously voted for the proposal. Appellees contend that following the October 26, 1991 meeting, they protested that the votes taken at the meeting were not valid as none of the directors could be considered disinterested directors and thus their votes as shareholders could not be counted. Appellees also asserted their right to inspect the corporation's books and records.[5]

On April 2, 1992, College Park directors met to ratify actions taken by the corporation at the special meeting and other occasions. On April 3, 1993, the appellees visited the College Park offices and sought inspection of the corporate books and records. They viewed the corporation's minute book and stock ledger, in addition to a series of promissory notes executed by College Park, Charles Shapiro, and other entities which Charles Shapiro owns or controls. When they

---

4. In their complaint, appellees alleged that they did not receive prior notice of the meeting. At trial, however, appellees abandoned the claim of lack of notice, and proceeded to argue that the only persons who voted upon the transaction were interested directors, which made the transaction void, ab initio.

5. Appellees assert that, by letter dated November 6, 1991, they objected to the proposed transaction on this basis. The letter, however, has not been included in the Record Extract to this Court.

requested other documents relating to the transactions described in the April 2, 1992 minutes, they were refused. Appellees filed this suit on July 15, 1992, against College Park and its directors, Charles S. Shapiro, Michael Shapiro, and Joan Smith, requesting "damages, an accounting, the appointment of a receiver, the imposition of a constructive trust, the dissolution of the corporation, attorneys' fees, costs and other legal and equitable relief."

Between 1991 and 1994, Shapiro and Jaffe guaranteed over $2 million in bonds and expended over $1 million for marketing, advertising, and other pre-construction activities. Clinton Associates also expended over $1 million in risk capital, hiring architects, and engineers. By 1994, Jaffe had secured leases with Safeway, Caldor, Fashion Bug, Baskin Robbins, and others, had fulfilled all conditions for the construction loan commitment, and had satisfied the debt ratio and pre-leasing requirements.

Without further shareholder action, on April 20, 1994, College Park conveyed the land to Clinton Crossings Limited Partnership in exchange for a fifty percent interest in Clinton Crossings Partnership and the establishment of a capital account in the amount of $6,272,640. Charles Shapiro and Jaffe both personally guaranteed Clinton Crossings Partnership's $21.5 million construction loan with NationsBank.[6]

It was projected that, upon completion of Phase I of the redevelopment, the project would have a value of $36.5 million and immediately realize an annual positive cash flow of approximately $1 million. As a result, College Park's cash flow was expected to go from negative to approximately $500,000 annually.

On October 4, 1994, appellees amended their complaint adding CCI, Clinton Crossings Partnership, and Clinton Associates as defendants, and alleged that the Clinton Crossings

---

6. At the time, Shapiro and Jaffe had a combined net worth of $40 million.

redevelopment was a corporate opportunity that belonged to College Park and was usurped by the appellants.

The matter was tried before the Circuit Court for Montgomery County from May 1 to May 4, 1995. On June 29, 1995, the trial court entered an interlocutory order granting appellees' request for an accounting, and appointed a special master to determine specific factual issues. The special master filed his Report of Factual Findings, Conclusions, and Recommendations ("Report") on October 17, 1997. In the Report, the master concluded:

These determinations will have significant impact on the relative financial positions of the parties. I have made these recommendations for legal decisions to the Court, since I am not a lawyer and do not believe I possess the appropriate expertise to make ultimate legal findings on these two issues. However, I did perform fact finding and analysis on these two issues to aid the Court in its decision. These specific issues I recommend for legal decisions are:

(1) The legality and appropriateness of the [College Park] board approval of the numerous related party loans made from CPWI to Mr. Shapiro and other Shapiro owned companies (the so called Interested Director issue).

(2) The legality of [College Park's] retroactive imposition of the fees inherent in the June 1982 Management Agreement between [College Park] and CSS Management.

No exceptions were taken to the Report.

On December 2, 1997, appellees filed a motion to appoint a receiver for College Park. Hearings on the motion were held on December 18, 1997, January 8, 1998, and February 9, 1998. A suggestion of bankruptcy for Charles Shapiro, president of College Park, was filed on February 6, 1998. On February 23, 1998, the trial court granted appellees' motion, appointing a single receiver for College Park, and a separate single receiver for other related Shapiro corporations,[7] stating that "the

---

7. The appointment of a receiver for the other related entities is not at issue in this appeal.

appointment of specific receivers and the duties and powers of the receivers shall be the subject of a further order by the Court." Appellants filed a notice of appeal. On March 27, 1998, the trial court appointed Neil H. Demchick as the receiver for College Park, specifying his powers and duties.

## MOTION TO DISMISS

Prior to filing briefs in this appeal, appellees filed a motion to dismiss, arguing that appellants "appealed the wrong order." They asserted that the February 23, 1998 order did not "appoint any receivers, and most importantly, it did not set forth the powers of any such receivers or terms upon which their appointment was conditioned." They contend that the February order was an "interlocutory order apprising the parties of the court's intent to enter a subsequent final order on the issue" and thus, unappealable. This Court denied appellees' motion to dismiss "without prejudice to appellees' right to move for dismissal in their brief." Appellees renewed their motion in their brief.

Maryland Code (1974, 1998 Repl.Vol.), § 12–303 of the Courts and Judicial Proceedings Article ("CJ") provides that appeals may be taken from certain interlocutory orders, including the appointment of a receiver.[8] The parties dispute whether the February 23, 1998 order was, in fact, the order "appointing a receiver" in this case.

The February 23, 1998 order provided:

WHEREAS, this Court previously having ruled, with respect to the transactions described in the Amended Complaint and the Special Master's Report, including the transfer of the Clinton Crossings Shopping Center from [College

---

8. Courts and Judicial Proceedings § 12–303 provides, in part:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(3) An order:

\* \* \*

(iv) Appointing a receiver but only if the appellant has first filed his answer in the cause.

Park] to [Clinton Crossing Partnership] done in April, 1994, that Charles Shapiro's son, Michael Shapiro, and his sister, Joan Smith, are and were not disinterested directors, that the transactions were not fair and reasonable to [College Park] and that the transactions constituted improper interested director transactions and usurpations of corporate opportunities.

Upon consideration of the pleadings, papers and evidence in this matter, the Report of the Special Master, the arguments of counsel and the Court's findings of fact and conclusions of law, it is this 23rd day of February, 1998, hereby ORDERED:

1.   A single receiver is appointed for [College Park].

2.   A separate single receiver is appointed for [Clinton Crossings Inc.], [Clinton Crossings Partnership], and [Clinton Associates].

3.   The parties shall consult with each other with a view toward agreement on the designation of (a) a receiver for [College Park] and (b) a receiver for [Clinton Crossings, Inc.], [Clinton Crossings Partnership], and [Clinton Associates].   Within seven days from the date of this Order, the parties shall provide the Court with the name or names of any agreed upon receiver or receivers and or in the absence of complete agreement, the name or names of any proposed receiver or receivers.   The permission of a proposed receiver must be obtained before that person's name is given to the Court.   The parties shall include a resume for each proposed receiver and an affidavit, in conformity with Md. Rule 13–302, executed by each proposed receiver.

4.   The appointment of the specific receivers and the duties and the powers of the receivers shall be the subject of a further order by this Court.

Appellants noted their appeal of this order on March 25, 1998.

A hearing was held on March 27, 1998, in which the parties disputed the powers and duties of the receivers, their compensation, particularities of language to be employed in the order, and the source of funds to be used by the receiver.

On that day, the trial court entered the order naming the receiver and specifying the receiver duties. Appellees contend that appellants improperly appealed the February 23, 1998 order, rather than the March 25, 1998 order that specifically named the receiver. We disagree.

"The right of appeal is given to test the validity of the order taking custody of the property by a receiver, not the propriety of the particular selection of the receiver so appointed." *Benningfield v. Benningfield*, 155 S.W.2d 827, (Tex.Civ.App.1941); See also *Buck v. Johnson*, 495 S.W.2d 291 (Tex.Civ.App.1973). In *Benningfield*, a receiver was appointed on May 9, 1940. That receiver, however, failed to qualify, and on May 15, 1940, a second receiver was appointed. Appellant appealed the second order. The court found that appeal of the second order was untimely, and the case was dismissed for want of jurisdiction.

In *Buck*, a receiver was appointed by the court in a real estate development suit in August 24, 1972, and no appeal was taken. The appellant later sought to terminate the receivership, which motion was denied. On appeal, appellant asserted fundamental errors concerning the appointment and continuation of a receiver. The court held that the appeal of the receiver's appointment was improper, reasoning that "When a trial court decides to appoint a receiver in a given case, the question to be decided from which the complaining party is allowed to appeal is whether the property in litigation should be taken into the custody of the court and administered by a receiver. In other words, the question is as to the propriety of having a receivership." *Buck*, 495 S.W.2d at 296.

While we recognize the factual difference between the cases cited and the one at bar, we find the reasoning insightful. The thrust of appellants' argument on appeal is that the trial court did not make proper findings to support the appointment of a receiver. Specifically, they argue that there was insufficient evidence to support the trial court's findings that the transaction was not fair and reasonable to the corporation and that appellants usurped a corporate opportunity. All of

these issues were generated by the trial court's order of February 23, 1998, wherein the trial court ordered the appointment of a receiver for College Park. To be sure, the trial court offered the parties the opportunity to agree on the individual to be selected, but it was the appointment of any receiver, not the appointment of a particular receiver, to which appellants objected. We find that this order was properly and timely appealed by the appellants, pursuant to CJ § 12–303(3)(iv).

## I. Corporate Opportunity

Appellants argue that the trial court erred in finding that the redevelopment plan for Clinton Crossings was a corporate opportunity that was usurped by appellants. Both parties rely on the case of *Independent Distributors, Inc. v. Katz,* 99 Md.App. 441, 637 A.2d 886, *cert. denied,* 335 Md. 697, 646 A.2d 363 (1994), for the proposition that officers or directors will not be held liable for usurpation of corporate opportunity if the transaction was fair and reasonable to the corporation. Several commentators, however, have criticized this Court's opinion in *Katz,* asserting that we "confus[ed] an interested director transaction with a corporate opportunity." Eric G. Orlinsky, *Corporate Opportunity Doctrine and Interested Director Transactions: A Framework for Analysis in an Attempt to Restore Predictability,* 24 Del.J.Corp.L. 451 (1999); See also James J. Hanks, Jr., *Maryland Corporation Law* § 6.23 (1995, 1999 Supp.) ("Hanks"). Therefore, we will begin our discussion with an analysis of interested director transactions and the doctrine of usurpation of corporate opportunity.

Concepts related to corporate opportunities and interested director transactions find their genesis in a director's duty of loyalty to the corporation. The longstanding common law rule in Maryland was "that any contract between a corporation and one of its officers or directors as to a matter in which the officer or director had a substantial personal interest was void or voidable." *Sullivan v. Easco Corp.,* 656 F.Supp. 531, 533 (D.Md.1987)(quoting *Chesapeake Const. Corp. v. Rodman,* 256 Md. 531, 536, 261 A.2d 156 (1970)). In 1976, Maryland

adopted Md.Code (1975, 1999 Repl.Vol.), § 2–419 of the Corporations and Associations Article ("CA") and rejected the common law rule.[9] Such action recognized that "an interest conflict is not in itself a crime or a tort or necessarily injurious to others" and "in many situations, the corporation and the shareholders may secure major benefits from a transaction despite the presence of a director's conflicting interest." Dennis Block, Nancy Barton, and Stephen Radin, *1 The Business Judgment Rule: Fiduciary Dutiies of Corporate Directors*, 266 (5th ed.1998)(citing 2 Model Bus.Corp.Act Ann. §§ 8.60 to .63 Introductory Comment at 8–397(3d ed.1996)).

Corporations and Associations § 2–419 provides that an interested director transaction is not void or voidable solely because of the conflict of interest and creates a "safe harbor" for certain transactions which satisfy the statute. Under the

---

**9.** Corporations and Associations § 2–419 governs Maryland interested director transactions. It provides, in part:

(a) *General Rule.*—If subsection (b) of this section is complied with, a contract or other transaction between a corporation and any of its directors or between a corporation and any other corporation, firm, or other entity in which any of its directors is a director or has a material financial interest is not void or voidable solely because of any one or more of the following:

(1) The common directorship or interest;

(2) The presence of the director at the meeting of the board or a committee of the board which authorizes, approves, or ratifies the contract or transaction; or

(3) The counting of the vote of the director for the authorization, approval, or ratification of the contract or transaction.

(b) *Disclosure and ratification.*—Subsection (a) of this section applies if:

(1) The fact of the common directorship or interest is disclosed or known to:

(i) The board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum; or

(ii) The stockholders entitled to vote, and the contract or transaction is authorized, approved, or ratified by a majority of the votes cast by the stockholders entitled to vote other than the votes of shares owned of record or beneficially by the interested director or corporation, firm, or other entity; or

(2) The contract or transaction is fair and reasonable to the corporation.

statute, an interested director could inform the shareholders or directors of his conflicting interests and give the board of directors or shareholders an opportunity to approve or ratify the transaction. Moreover, a nondisclosed interested director transaction may be valid, if it is found to be fair and reasonable to the corporation. CA § 2–419(b)(2).

By contrast, "[m]ost corporate opportunities do not involve transactions with the corporation; rather, they involve transactions that are taken from the corporation." Hanks, at 220.10. The principles used to determine whether a director is interested or disinterested "turn upon the involvement of the director in the contract or transaction to which the corporation is a party. A corporate opportunity typically presents the reverse factual situation: the non-involvement of the corporation in a contract or transaction in which it may have an interest." Hanks, § 6.23, at 220.8, n. 328. "Simply stated, an interested director transaction statute applies where a director seeks to transact business with the corporation. Conversely, a transaction should be analyzed under the corporate opportunity doctrine where a director seeks to take an opportunity from the corporation." 24 Del.J.Corp.L. at 457.

The doctrine of usurpation of corporate opportunity attempts to "preclude[ ] a director or officer from appropriating for himself a business opportunity that 'belongs' to the corporation." *Law of Corporate Officers and Directors* p. 1 ch. 4. The Court of Appeals describes the prohibition on usurpation of corporate opportunities by stating that corporate personnel are "precluded from diverting unto themselves opportunities which in fairness ought to belong to the corporation." *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 49, 382 A.2d 564 (1978). We have said that "[t]his rule, known as the corporate opportunity doctrine, prohibits a fiduciary from usurping, for his personal benefit, a business opportunity rightfully belonging to the corporation." *Lyon v. Campbell,* 120 Md.App. 412, 440, 707 A.2d 850, *cert. denied,* 350 Md. 487, 713 A.2d 980(1998). "Under Maryland law, one who stands in a fiduciary relationship to a corporation must not acquire or

interfere with property in which the corporation has an interest or a reasonable expectancy in detriment to the corporation." *Lyon,* 120 Md.App. at 440, 707 A.2d 850.

■ In determining whether an opportunity is a corporate opportunity, Maryland follows the "interest or reasonable expectancy" test. *Katz,* 99 Md.App. at 458, 637 A.2d 886. This test "focuses on whether the corporation could realistically expect to seize and develop the opportunity. If so, the director or officer may not appropriate it and thereby frustrate the corporate purpose." *Katz,* 99 Md.App. at 458, 637 A.2d 886 (quoting Hanks, § 6.23 at 219). "If the opportunity is a corporate one, then the director or officer to whom it is presented or who becomes aware of it must first present it to the corporation, before pursuing it himself. . . . Only if the corporation rejects the opportunity may a director or officer exploit it for his own benefit." Hanks, § 6.23 at 220.7 to 220.8. "When an officer or director breaches his duty of loyalty to the corporation by usurping a corporate opportunity for his personal benefit, the corporation may claim all of the benefits of the transaction for itself." *Pitman v. Aran,* 935 F.Supp. 637, 645–46 (D.Md.1996).

This Court discussed in *Katz* both interested director transactions and the usurpation of corporate opportunity. In *Katz,* minority shareholders brought suit against the corporation and its directors and shareholders, alleging that the director shareholders had usurped a corporate opportunity when they declined to purchase property on behalf of the corporation, formed a separate partnership to purchase the property, and subsequently leased the property to the corporation. We determined that the transaction should be subject to the corporate opportunity analysis. We then concluded that the transaction, as it was not fair and reasonable to the corporation, constituted a usurpation of corporate opportunity, reasoning that "the linchpin of the [corporate opportunity] rule and the exceptions is fairness and reasonableness to the corporation." *Katz,* 99 Md.App. at 459, 637 A.2d 886.

■ Criticisms of *Katz* stem from the application of the "fair and reasonable" standard of interested director transactions to the usurpations of corporate opportunity analysis. The critics argue that "there is no fairness/reasonableness exception to the requirements of the corporate opportunity doctrine." Hanks, § 6.23 at 220.10.

> Taking a profitable opportunity from the corporation is inherently unfair. Therefore, fairness is not a part of the corporate opportunity analysis in the same sense that it is in an interested director transaction in determining whether the transaction is fair. Rather, fairness only plays a small role in determining whether a corporate opportunity exists in the first place.

24 Del.J.Corp.L. at 463. Because we find that appellants' involvement in the redevelopment transaction was not a usurpation of corporate opportunity, we are not required, in this case, to reconsider *Katz*.

Essentially, appellees complain about the propriety of the transaction, with emphasis on College Park's relinquishment of College Park's fee simple interest in its property, College Park's reduced management role in the redevelopment project, and appellants' personal use of corporate assets. Although Charles Shapiro's involvement in the redevelopment project clearly demonstrates a conflict of interest, this is not a situation where appellants capitalized on an opportunity that should have been presented to the corporation, but was not. Rather, the corporation entered into a business arrangement with other entities in which certain directors had, or potentially had, a direct financial interest. Therefore, we hold that the transaction did not constitute a usurpation of corporate opportunity.

■ We turn now to the issue of whether the trial court properly conducted the analysis required under CA § 2–419 for interested director transactions. In reviewing the Order of February 23, 1998, we note that the order refers to previous rulings on the various transactions, the "Report of the Special Master," and to the trial court's "findings of fact and conclu-

sions of law." We readily acknowledge the conclusions of law, or perhaps, conclusions of mixed law and fact, but the "findings of fact" upon which the trial court relied are less clear. Although there is reference to the Report of the Special Master, to which no exceptions were taken, and the trial court recognized the treatment of funds as "fungible" between College Park and the other Shapiro entities as identified by the Special Master, the trial court does not direct the findings of that Report to an interested director analysis and to the determination of whether the Clinton Crossings transaction was fair and reasonable. Thus, we are unable to review the factual underpinnings of the trial court's conclusion that the Clinton Crossings transaction was not fair and reasonable. Perhaps that conclusion was based on the loss of management rights or purely on the financial results of the transactions, but we cannot be sure. For example, the extent to which the treatment of funds, both earned and borrowed, between the different entities affected College Park's ability to participate in the Clinton Crossings project could be part of the fair and reasonable calculus. Absent such treatment, College Park may have been able to do the project alone, achieve a better equity position, or preserve a management role. Under the circumstances, we will remand for reconsideration based on the analysis of an interested director transaction.

Part of that analysis will involve a determination of who are the interested directors. The trial court found that there were no disinterested directors. At oral argument, the parties disputed whether appellant Joan Smith was properly considered an interested director. Because the case is to be remanded to the trial court for reconsideration under CA § 2–419, we will discuss Joan Smith's classification as an interested director, based on her family and financial relationship with Charles Shapiro and his financial interest in the transaction.

Both the Model Business Corporations Act ("MBCA") and the American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) ("ALI") expressly define interested director. The ALI provides:

(a) A director or officer is "interested" in a transaction or conduct if either:

(1) The director or officer, or an associate of the director or officer, is a party to the transaction or conduct;

(2) The director or officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation;

(3) The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary director's fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

(4) The director or officer is subject to a controlling influence by a party to the transaction or conduct or person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation.

ALI § 1.23(1).

The MBCA defines "conflicting interest" as

(1) "Conflicting interest" with respect to a corporation means the interest a director of the corporation has respecting a transaction effected or proposed to be effected by the corporation . . . if:

(i) whether or not the transaction is brought before the board of directors of the corporation for action, the director knows at the time of commitment that he or a related person [10] is a party to the transaction or has a beneficial

---

**10.** Related person is defined as "(i) the spouse (or a parent or sibling thereof) of the director, or a child, grandchild, sibling, parent (or

financial interest in or so closely linked to the transaction and of such financial significance to the director or a related person that the interest would be reasonably expected to exert an influence on the director's judgment if he were called upon to vote on the transaction. [Emphasis added.]

Model Bus.Corp.Act. § 8.60 (1999).

Appellants assert that Maryland rejected the MBCA and ALI definition of "interested director" and thereby rejected the concept that a director who may be related to a party with a material financial interest in the transaction would also be classified as an interested party. The history of CA § 2–419 suggests that that conclusion is too broad.

■ The Maryland statute was modeled after statutes of other jurisdictions, including Delaware, New York, and California. The Official Comment to the section provided: [11]

Prior to 1976, the Maryland General Corporation Law, unlike most state business corporation laws, contained no provision relating to so called "interested director transactions": that is, transactions between a corporation and any corporation, firm, or other entity in which any of its directors is a director or has a material financial interest.

Chapter 567, Acts of 1976, adds a new § 2–419 to the Corporation Law to apply to those transactions. This section—which was modeled after similar provisions in Delaware, New York, California, and other jurisdictions-was added to ensure uniformity of treatment of those transactions in Maryland, as well as to provide clear standards to corporations and directors who engage in such transactions.

_____

spouse thereof) of the director, or an individual having the same home as the director, or a trust or estate of which an individual specified in this clause (i) is a substantial beneficiary; or (ii) a trust, estate, incompetent, conservatee, or minor of which the director is a fiduciary."

11. This Official Comment initially appeared in the 1977 Supplemental Code. The statute was amended in 1983 to clarify the relationship between the indemnification of corporate directors found in CA § 2–418 and this statute.

CA § 2–419 (1977 Cum.Supp.). The Delaware, New York, and California statutes are all quite alike in the treatment of interested director transactions.[12] Similar to Maryland's stat-

---

**12.** The Delaware statute provides, in part:
§ 144 Interested directors; quorum.

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

(1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

The New York statute provides, in part:
§ 713. Interested directors

(a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purpose:

(1) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the vote of such interested director or, if the votes of the disinterested directors are insufficient to constitute an act of the board as defined in section 708 (Action by the board), by unanimous vote of the disinterested directors; or

(2) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or

ute, none define the term "interested director." In New York, case law has defined a director's interest as "either self-interest in the transaction at issue or a loss of independence because a director with no direct interest in a transaction is controlled by a self-interested director." *Park River Owners Corp. v. Bangser Klein Rocca & Blum, LLP*, 269 A.D.2d 313, 703 N.Y.S.2d 465, 466 (2000). All of the cited approaches ultimately focus on a director's ability to exercise independent

financial interest are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders.

(b) If a contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, is not approved in accordance with paragraph (a), the corporation may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board, a committee or the shareholders.

The California statute provides, in part:

§ 310. Contracts in which director has material financial interest; validity (a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest, is either void or voidable because such director or directors or such other corporation, firm or association are parties or because such director or directors are present at the meeting of the board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if

(1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders (Section 153) in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or

(2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified, or

(3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified.

judgment and the expected influence of a particular relationship on the director. That is the appropriate subject of inquiry in determining whether a director is to be considered an interested director in a particular transaction.

The underlying purpose of the interested director statute is clear. "Directors are required to avoid only those self-interested actions which come at the expense of the [corporation] or its shareholders." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del.Ch.1994), *aff'd*, 663 A.2d 1156 (Del.Supr.1995). An interested director transaction may still be approved by a neutral decision making body. *Oberly v. Kirby*, 592 A.2d 445, 467 (Del.Sup.1991). In other words, when a director's loyalty is questioned, courts must seek to ascertain whether the conflict "has deprived stockholders of a 'neutral decision-making body.'" *Technicolor*, 663 A.2d at 1170.

The definitions of the MBCA and the ALI related to interested directors and conflicting interests reflect this same consideration. When the director is actually involved in the transaction, determination is easy. When the director has no direct interests in the conflicting transaction, neither model creates a per se rule based on a familial or business relationship because a relationship between the parties does not necessarily destroy an individual's independent judgment. The pivotal provision is the second prong of the analysis, whether the relationship "would reasonably be expected to exert an influence on the director's judgment." MBCA; see also ALI ("and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation"). The adoption of a per se rule would effectively undermine the purpose of the statute. If an otherwise uninterested director were to be adjudged an interested director based solely on his relationship, familial or otherwise, to another director interested in the transaction, directors who may well retain independence and their own business judgment will be precluded from considering the transaction. On the other

hand, to conclude that directors are automatically disinterested because they are not directly involved in the transaction would also undermine the goal of a neutral decision making body, as some directors, because of their familial, personal, or financial relationship, may well be influenced by those relationships to the detriment of the corporation.

Therefore, when a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction, it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute.

We are unsure whether the trial court determined Joan Smith to be an interested director simply by virtue of her status as Charles Shapiro's sister. On remand, the trial court should evaluate whether the relationship between Joan Smith and Charles Shapiro, together with their direct or indirect interests in the transaction, would reasonably be expected to influence her decision and compromise her impartiality. If it is then determined that there were no disinterested directors, the trial court should evaluate the Clinton Crossings transaction from the "fair and reasonable" perspective with findings that support the determination.

## II. Illegal, Oppressive, or Fraudulent Conduct by the Directors

Appellants argue that the trial court erred in appointing a receiver when it failed to make a finding that the corporate directors' conduct was illegal, oppressive, or fraudulent. Again, we cannot determine precisely on what the trial court's decision was based. Review of the February 23, 1998 order indicates specific references to the trial court's ruling regarding the interested director transaction and the usurpation of corporate opportunity. Perhaps a different result would occur based on the review of the Clinton Crossings transaction.

It is important to recognize, however, that the trial court could, with proper findings, still appoint a receiver and may examine the actions of the directors as a whole, including

those actions examined by the Special Master, in making its ultimate determination. Because we have remanded the case to the trial court for findings under the interested director transaction statute, CA § 2–419, the trial court should reexamine its appointment of a receiver and provide the legal and factual determinations supporting its ruling.

We note that the appointment of a receiver is an extraordinary relief and should "be exercised with great circumspection." *Grant v. Allied Developers, Inc.*, 44 Md.App. 560, 565, 409 A.2d 1123 (1980). "[I]f it does not clearly appear that there is fraud, spoliation, or imminent danger of the loss of the property unless immediate possession is taken by the court, a receivership should not be ordered." *Brown v. Brown*, 204 Md. 197, 211, 103 A.2d 856 (1954). "A court should not appoint a receiver on anticipated grounds. Rather, there must be an 'imminent danger of the property being lost, injured, diminished in value, destroyed, squandered, wasted, or removed from the jurisdiction.' " *Hamzavi v. Bowen*, 126 Md.App. 492, 497, 730 A.2d 274 (1999). "Upon proper application and proof, equity may exercise the appointment power so as to preserve the assets of a solvent corporation, where the actions of directors, officers, or other shareholders are ultra vires, fraudulent, or otherwise illegal." *Grant*, 44 Md.App. at 565, 409 A.2d 1123.

### III. Estoppel

Appellants assert that appellees were estopped from bringing suit because appellees failed to appear at the shareholders meeting at which the Clinton Crossings transaction was considered and voted upon, thereby acquiescing to the transaction.

As previously noted, in appellees' initial complaint against College Park, it asserted that it was not given notice of the October 26, 1991 shareholders meeting during which the transaction was voted upon. At trial, however, appellees abandoned its claim of lack of notice and proceeded to argue that the only persons who voted upon the transaction were interested directors, which made the transaction void ab initio.

Appellants assert that by withdrawing the issue at trial, and not eliciting testimony from Mr. Greenfield on this issue, appellees conceded this argument. Appellants suggest that appellees withdrew this contention because appellants were prepared to cross-examine Mr. Greenfield and produce the notice envelope that contained a handwritten notation, "Rec 10/25/91 at 5 p.m." Appellants conclude that appellees recognized that Mr. Greenfield had perjured himself during a deposition and would likely perjure himself at trial. Although an interesting argument, it is not supported by the record and, thus, is only speculation.

Even if appellees were to have received notice of the October 26, 1991 meeting, albeit at 5 p.m. less than two working days before the meeting, appellees absence alone would not estop appellees from bringing suit. Appellants cite the cases of *Pinnacle Consultants v. Leucadia Nat'l Corp.*, 261 A.D.2d 164, 689 N.Y.S.2d 497 (1999), *aff'd,* 94 N.Y.2d 426, 706 N.Y.S.2d 46, 727 N.E.2d 543 (2000), and *Tagarelli v. McCormick,* 614 So.2d 11 (Fla.Ct.App.1993), for the proposition that "a shareholder is properly estopped from maintaining a shareholders derivative suit when he has 'acquiesced' in the challenged transaction." Although it is true that one who acquiesced, ratified, or participated in the transaction cannot bring suit thereafter, appellees' reliance on *Tagarelli* and *Pinnacle* is not controlling. *See Winter v. Bernstein,* 149 Misc.2d 1017, 566 N.Y.S.2d 1012, 1014 (N.Y.Sup.), *aff'd,* 177 A.D.2d 452, 576 N.Y.S.2d 549 (1991) ("A shareholder is estopped to challenge a corporate policy which he or she affirmatively approved, or of which the shareholder had knowledge but to which no objection was interposed"). In *Pinnacle,* the shareholder bringing suit was estopped because the trial court found that the proxy statement discussed in detail the facts regarding the merger and stated that failure to respond would be counted as a vote in favor of the transaction. The plaintiff, by her silence, was found to have voted in favor of the transaction, and thus was estopped from bringing suit. In *Tagarelli,* the shareholder received notice of the meeting in

which the transaction was to be discussed, failed to attend, received the report detailing the transaction and the company's intent to enter into it. The shareholder made no objection to the report until he filed suit.

In the present case, appellants raised the issue of estoppel as an affirmative defense in the answer to the court, Post–Trial Memorandum to the trial court, and Brief on Outstanding issues. Neither party has directed this Court to the trial court's ruling on this issue, nor have we found such a ruling. Therefore, on remand, the actions of appellees may be examined to determine whether they acquiesced, ratified, or participated in the transaction, but their absence from the meeting alone would not constitute an estoppel. See *Lash v. Lash Furniture Co. of Barre, Inc.,* 130 Vt. 517, 296 A.2d 207, 211 (1972)("[A] stockholder-litigant may be estopped from pressing a claim in favor of the corporation because of his own involvement.")

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**