895 A.2d 355

**STORETRAX.COM, INC.**

**v.**

**Joshua GURLAND.**

**Nos. 418, 1047 Sept. Term, 2004.**

Court of Special Appeals of Maryland.

March 31, 2006.

52

54

Ronald L. Early (Lerch, Early & Brewer, Chartered, on the brief), Bethesda, for Appellant.

Thomas D. Murphy (James A. Mood, Jr., on the brief), Rockville, for Appellee.

Panel: KENNEY, DEBORAH S. EYLER and RAYMOND G. THIEME, (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Two appeals, No. 418, September Term 2004, and No. 1047 September Term 2004, involve the same parties and arose from the same dispute between Joshua Gurland ("Gurland") and Storetrax.com, Inc. ("Storetrax"). The appeals were argued at the same time. Because the facts and issues are interrelated, we have addressed both appeals in a single opinion to be filed in each case. In case number 1047 ("Case I"), Storetrax appeals the judgment of the Circuit Court for

Montgomery County, granting Gurland's motion for partial summary judgment. Storetrax poses one question, which we have slightly reworded:

Did the circuit court err in granting Gurland's motion for partial summary judgment because genuine disputes of material fact exist as to whether Gurland materially breached the terms the employment agreement?

We answer that question in the affirmative and shall reverse the judgment of the circuit court.

In case number 418 ("Case II"), Storetrax appeals the judgment of the Circuit Court for Montgomery County, finding that Gurland had not breached his fiduciary duties to the corporation. Storetrax poses three questions for our review, which we have reworded as follows:

A. Did the circuit court commit reversible error in applying the substantive law of Maryland to Storetrax's breach of fiduciary duty claim, rather than the substantive law of the state of incorporation, Delaware?

B. Did the circuit court err in finding that Gurland did not breach his fiduciary duties to the corporation?

C. Did the circuit court err in denying Storetrax the opportunity to cross-examine Gurland regarding a statement he had made to another member of Storetrax's board of directors?

For the following reasons, we answer each of these questions in the negative and shall affirm the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

In 1997, Joshua Gurland conceived of the idea for an Internet based computer database containing commercial property listings. In January 1998, he incorporated Storetrax.com, originally a Maryland corporation, for that purpose. Gurland operated Storetrax as its sole employee until 1999.

Desiring to grow the corporation, in 1999, Gurland began discussing with potential investors the idea of issuing stock to raise capital. Storetrax was reincorporated in Delaware, and

on October 25, 1999, Storetrax, through Gurland as its president and CEO, entered into a stock purchase agreement with several investors. The stock purchase agreement provided for an Employment Agreement ("the Agreement") between Gurland and Storetrax, which was also executed on October 25, 1999.

The Agreement contained the following relevant provisions:

**1. *Employment and Term.*** The Company agrees to employ the Employee and the Employee agrees to work for the Company, subject to the terms and conditions below, for a term of one (1) year, beginning on the date first written above and ending on the first anniversary of such date (the "Initial Term"). At the end of the Initial Term, this Agreement shall automatically renew for successive one (1) year periods unless either party hereto shall notify the other in writing not less than (90) days prior to the expiration of the Initial Term or any renewal term....

**2. *Compensation; Benefits.*** Subject to the terms and conditions of this Agreement the Company shall pay to the Employee a base salary as set forth on *Schedule A* (as the same may be increased from time to time, the "Base Salary"), attached hereto and made a part hereof, payable in accordance with the Company's regular payroll policies.... On at least an annual basis, the Company shall review the Employee's performance and may make increases to the Base Salary if the Executive Committee of the Company's Board of Directors determines that any such increase is warranted....

**4. *Title; Duties.*** The Employee shall initially be employed as President and Chief Executive Officer of the Company. The Employee shall diligently, conscientiously and exclusively devote his full time and attention and his best efforts to discharge the duties assigned to him by the Company.... The Employee acknowledges that his title and duties may change in the event that a prospective substantial investor in the Company specifically requires such a change as a condition to investment in the Company.

### 6. *Termination by the Company.*

(a) The Company shall have the right to terminate this Agreement, with or without Cause (as defined below), at any time during the term of this Agreement by giving written notice to the Employee. The termination shall become effective on the date specified in the notice, which termination date shall not be a date prior to the date ten (10) days following the date of the notice of termination itself. In the event that this Agreement is terminated by the Company for Cause (as defined below), the Company shall pay the Employee the Base Salary due him under this Agreement (plus all accrued and unpaid benefits and reimbursable expenses) through the day on which such a termination is effective, in accordance with the Company's normal payroll practices. In the event that the Employee is terminated without Cause, the Company shall, subject to the provisions of this Agreement and in lieu of any other payment, pay to the Employee compensation equal to twelve (12) months of the Employee's Base Salary as of the date of termination (plus any earned bonuses and all accrued and unpaid benefits and reimbursable expenses), payable in accordance with normal payroll practices.

(b) For purposes of this *Section 6*, *"Cause"* shall mean (i) a material continuing breach by the Employee of any covenant or condition hereunder or a material failure of performance by the Employee under this Agreement following written notice to Employee of such material continuing breach or material failure and failure by the Employee to cure the same within thirty (30) days of such notice; (ii) conviction of, or plea of nolo contendere by, the Employee of any federal, state or local felony; (iii) material violation by the Employee of the Company's policies as set forth in the Company's personnel handbook, if one has been adopted, or announced by Company management from time to time; (iv) the performance by the Employee of any material act or omission demonstrating an intentional or reckless disregard of the interests of the Company; (v) misappropriation or attempted misappropriation of a material business opportu-

nity of the Company for the benefit of the Employee; or (vi) repeated and deliberate failure to follow the direction of the Company's Board of Directors of lawful instructions or actions.

**15. *Notices.*** Any notice expressly provided for under this Agreement shall be in writing, shall be given either manually or by mail and shall be deemed sufficiently given when actually received by the party to be notified or when mailed, if mailed by certified or registered mail, postage prepaid, addressed to such party, at their addresses as set forth below . . . .

**16. *Governing Law.*** This Agreement shall be executed, construed and performed in accordance with the laws of the State of Maryland without reference to conflict of laws principles. The parties agree that the venue for any dispute hereunder will be the state or federal courts sitting in Maryland and the parties hereby agree to the exclusive jurisdiction thereof.

**18. *Entire Agreement; Amendments.*** This Agreement constitutes and embodies the entire agreement between the parties in connection with the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings in connection with such subject matter. No covenant or condition not expressed in this Agreement shall affect or be effective to interpret, change or restrict this Agreement. In the event of a conflict or inconsistency between the terms of this Agreement and the Company's policies regarding employees, the terms of this Agreement shall supersede the conflicting or inconsistent Company policies. No change, termination or attempted waiver of any of the provisions of this Agreement shall be binding unless in writing signed by the Employee and on behalf of the Company by an officer thereunto duly authorized by the Company's Board of Directors (or its compensation committee, if one exists). No modification, waiver, termination, rescission, discharge or cancellation of this Agreement shall affect the right of any party to enforce any other provision

or to exercise any right or remedy in the event of any other default.

Schedule A to the Agreement set Gurland's initial salary at $135,000.

Following execution of the Agreement, Gurland, in addition to serving as the corporation's President and CEO, served as a director on Storetrax's five member Board of Directors ("the Board"). In January 1999, one of the investors and co-chairman of the Board, Robert Rosenfeld, expressed interest in working for Storetrax on a full time basis and becoming Storetrax's CEO. Gurland agreed to relinquish that title and serve solely as the corporation's president.

In November 2000, after several of the company's directors and officers requested an increase in compensation, a panel of four of the corporation's vice presidents were entrusted to settle the salary requests and set a compensation schedule. Pursuant to that schedule, Gurland's salary was decreased to $115,000, but he was provided the potential of earning an additional $50,000 worth of stock options.

In early 2001, Rosenfeld resigned. Tom McCabe was hired as Storetrax's new CEO in April 2001, and Gurland was asked to relinquish the title of president so that McCabe could serve as both the president and CEO. Gurland agreed and assumed the title of Senior Vice President of Technology and Product Strategy.

During the summer of 2001, McCabe was fired, and Beth Stewart, one of the investors and co-chairman of the Board, assumed the titles of president and CEO. Soon afterwards, Storetrax began to prepare for relocation to a new office facility. Around that time, Gurland met with Stewart and requested an increase in salary to $150,000 per year.

According to Gurland, he made the request because he thought that his salary did not reflect his value to the corporation or the number of hours he worked. He did not characterize his request for a higher salary as an ultimatum, but later said that he probably would have left the corporation had his request not been granted.

Through a series of emails, Stewart eventually granted Gurland's request for an increase in salary. Stewart and Krista Di Iaconi, Storetrax's vice president of finance and operations, however, maintain that Gurland's demand for a salary increase came at a time when the corporation was relocating and in need of Gurland's services to reconnect the corporation's computer system. Stewart claimed that the corporation acquiesced to Gurland's ultimatum only because it could not have effectuated the move without him. As a result of Gurland's untimely demand, the Board, in Gurland's absence, decided to terminate Gurland upon completion of the move.

After his salary was increased, Gurland requested that the Agreement be amended to reflect the change. Even though Storetrax had not notified Gurland, pursuant to sections 1 and 15 of the Agreement, that it did not wish to renew the Agreement, Stewart reported to Gurland in an email, "no one at Storetrax ([Stewart], Mark Spoto, Krista, Rob, Alan, Don) think you have a valid contract with the company, nor does any other employee have a contract." Desiring to know if his contract was still valid, Gurland contacted several individuals at Storetrax, including the corporation's counsel. Counsel for Storetrax informed Gurland that he "had not draw[n] any conclusion[s] as to the current status of [the Agreement.]"

In November 2001, Storetrax requested all of its employees to agree to a reduction in salary because the corporation was experiencing a cash shortage. According to Gurland, he agreed to a five to ten percent reduction in his salary, but he and Stewart never agreed on the amount of his new salary. Stewart maintains that Gurland agreed to reduce his salary to $135,000.

On November 15, 2001, Stewart escorted Gurland to his car. There, she stated: "I think it's time for you to find a new job." Upon further inquiry by Gurland, Stewart informed him that he was fired and instructed him to report to the office that weekend to gather his personal effects. Stewart contends that, at the time she fired Gurland, he informed her that he

"knew" that he was not entitled to severance pay. Gurland denies making that statement.

Upon his termination, Gurland contacted Di Iaconi to request a letter detailing the reasons for his termination. Gurland asked for the letter believing it was necessary to collect unemployment benefits.

On November 19, 2001, Stewart sent Gurland a letter confirming his termination. The letter also stated, "as you acknowledged to me during our discussion on Thursday night, November 15, Storetrax does not owe you any other payments, including severance payments." Moreover, Stewart reminded Gurland that, despite his termination, he was still a member of the Board, explaining:

> As you know your seat on the Board of Directors and the term of your service as a director is unaffected by the conclusion of your employment at Storetrax. I look forward to seeing you at the next Board meeting on December 11[ ] and remind you of your fiduciary obligations to Storetrax as a member of the Board of Directors.

Stewart did not remark on the reason for Gurland's termination.

In response, on November 30, 2001, Gurland wrote a letter to Stewart in which he acknowledged his termination. Gurland's letter also stated, in pertinent part:

> I did not, on November 15[ ] or at any other time, advise you that I was not entitled to severance. In fact, quite to the contrary, I fully expect that Storetrax will honor its obligations under my employment contract—the contract that you presented to me and asked me to sign in October of 1999 in accordance with the closing of the Series A financing. I further expect to receive my year-end bonus for 2001 that all salaried employees are receiving given that we met the goal before I was terminated.

On December 11, 2001, Gurland sent a letter to the Board, in which he claimed that Stewart had not informed him of the reason for his termination. He also discussed the Agreement, indicating to the Board that he believed the Agreement was

valid and that, under its terms, he was entitled to one year of severance pay because he had been terminated "without cause." The December 11 letter, also stated, in relevant part:

(On November 14, 2001 [Stewart] unilaterally reduced my Base Salary from $150,000 to $135,000 (retroactively to November 1, 2001) without my consent. This constitutes a breach of the Agreement and triggers the 12 months severance pay in accordance with [Section] 8b).

* * *

Accordingly, the Agreement is in full force and effect, and I am due the severance package set forth in [Section] 6(a). Storetrax is in breach of the Agreement at this time, as I did not receive my regular paycheck on November 30, 2001. I regret that we have come to this point, and sincerely hope that we can resolve the severance issue amicably and in a timely fashion. However, I have consulted an attorney and will not hesitate to avail myself of every possible remedy in the event of a dispute. If the issue remains unresolved as of December 21, 2001 I will instruct my attorney to proceed.

On December 20, 2001, Storetrax responded to Gurland's December 11 letter through counsel. Storetrax indicated to Gurland that, due to his change of job title and downward adjustments in salary, the corporation no longer believed that the Agreement was valid. The letter avowed: "[Storetrax] believes that it owes you no severance under the employment agreement because the course of dealing between you and the Company shows that the compensation aspects of the agreement are of no force and effect." Moreover, Storetrax announced to Gurland that, had the Agreement still been in effect, it would have informed him that he was fired for cause. The letter provided, in relevant part:

If you had told Ms. Stewart that you believed that the employment agreement was in effect, and that you were owed a year's severance (which could cripple the Company), Ms. Stewart would have informed you that you were being terminated for "cause" under the employment agreement. In an effort to be sensitive to you, Ms. Stewart did not raise

the issue of "cause" for your termination, because she did not think it was necessary. The Company desires to part with you graciously, and in a manner that allows the Company to give references to your prospective employers. While you were taking the position that no severance was owed there was no need to tell you that "cause" existed for your termination, and there was no reason to discuss the details of "cause" for termination.

Again, the Company does not intend to belabor all of the facts bearing on your job performance. You know that your job performance has been repeatedly called to your attention verbally and in emails, by various persons including Ms. Stewart. Many senior people at Storetrax have worked with you over the last 2 years. All of the downward revisions to your job description, title and salary have come at the request of senior management based upon your ability to successfully execute various tasks. Among other things, (1) you have refused to direct your energies in ways that would contribute to the Company (e.g., sales) insisting instead upon performing many menial technology tasks, (2) you disconnected the Company's server in mid-August and refused to hook it up until the Company agreed to your demand of a salary increase, and (3) you have undermined employee morale and encouraged efforts detrimental to the Company (e.g., the November 16, 2001 employee letter to the Board).

Therefore, the Company believes that, even if the employment agreement were in effect, it has "cause" to terminate your employment under Sections 6(b)(i) ("material failure of performance") and 6(b)(iv) ("reckless disregard of the interests of the Company") of the employment agreement.

... If you desire to litigate this issue, the Company is prepared to defend itself, as well as to assert any counterclaims it may have against you for breach of your fiduciary duties as an executive and Director of the Company.

The senior management of Storetrax and the Board of Directors (excepting yourself) have each reviewed this letter and the facts surrounding your demand for severance. Ev-

eryone concurs with the Company's refusal to consider any severance package.

In January 2002, Alan Wurtzel, a member of Storetrax's Board, reportedly spoke with Gurland in an effort to settle the dispute over the severance package.[1] According to Wurtzel, he tendered a settlement offer on behalf of Storetrax and Gurland assured him that he would consider the offer and would "call [Wurtzel] again to continue the discussions."

Gurland never responded to the settlement offer, and on January 31, 2002, he filed a complaint in the Circuit Court for Montgomery County, alleging that Storetrax breached the Agreement by failing to pay him severance after terminating him "without cause." Gurland sought $150,000 in damages. The complaint indicated Storetrax's current address and was mailed to the corporation's resident agent in Maryland. Gurland also filed a motion for summary judgment along with the complaint.

Afterwards, Gurland went to Storetrax's Maryland office twice, but he never informed anyone there, including members of the Board, that he had filed the complaint. In addition, even though the Maryland agent received the complaint and motion for summary judgment and properly forwarded it to the corporation's resident agent in Delaware, Storetrax was not informed of the complaint and the motion for summary judgement in time to file a timely answer or opposition to the motion. As a result, on March 8, 2002, the circuit court granted Gurland's motion for summary judgment by default and entered a judgment against Storetrax in the amount of $150,000.

Ten days later, Gurland petitioned for writ of garnishment to attach Storetrax's bank account. The writ was granted on March 19, 2002.

---

1. Wurtzel was not called as a witness at trial, but his affidavit was submitted by Storetrax in a motion to alter or amend following the court's judgment in favor of Gurland.

Also on March 19, 2002, Storetrax received the notice of judgment, which was the first occasion the corporation received actual notice that Gurland had filed the breach of contract lawsuit. The following day, Storetrax was contacted by its bank and informed that its account was being garnished for $150,000.

On March 21, 2002, Storetrax wrote a letter to Gurland, requesting that he voluntarily set aside the default judgment and writ of garnishment in order to permit Storetrax to defend the cause of action on the merits. Gurland denied both requests.

On April 3, 2002, Storetrax filed a motion for revision of judgment pursuant to Maryland Rule 2–535, requesting that the court set aside the summary judgment by default. Storetrax also filed a motion in the circuit court to quash the writ of garnishment. Following a hearing, on April 29, 2002, the circuit court denied the motion for revision of judgment. The court also denied the motion to quash the writ of garnishment.

Storetrax appealed, and in an unreported opinion, *Storetrax.com, Inc., v. Gurland*, No. 0561, September Term, 2002 (filed August 1, 2003), a panel of this Court held that the circuit court had abused its discretion in denying Storetrax's motion to set aside the summary judgment by default. The summary judgment by default was vacated and the case was remanded for further proceedings.

On November 8, 2002, Storetrax filed a complaint in the Circuit Court for Montgomery County (Case II), alleging that, by failing to inform the corporation of his pending lawsuit and by obtaining a summary judgment by default and writ of garnishment against the corporation, Gurland breached his fiduciary duties that he owed to the corporation as a member of the Board. Storetrax also alleged that Gurland's failure to consent to lifting the summary judgment by default and to relinquish the writ of garnishment, in spite of the Board's requests to do so, constituted a continuing breach of his fiduciary obligations. Storetrax moved for summary judgment, seeking $250,000 in compensatory damages, among oth-

er relief. Gurland timely filed an answer and opposition to Storetrax's motion for summary judgment.

A bench trial in Case II commenced on March 1, 2004. The circuit court found in favor of Gurland, and Storetrax noted a timely appeal to this Court on May 5, 2004.

Meanwhile, on remand of the breach of contract action (Case I), the circuit court scheduled a jury trial to commence June 3, 2004. On May 19, 2004, Gurland moved for partial summary judgment on Storetrax's defense that it terminated him "for cause." In support of his motion, he argued that it was undisputed that Storetrax never provided him with written notice that he was being terminated "for cause," as required by the express terms of the Agreement. Storetrax opposed the motion, and in support of its opposition, attached as Exhibit A its December 20, 2001 letter to Gurland. The circuit court heard oral argument on the motion immediately before the trial began and granted Gurland's motion for partial summary judgment.

The case, thereafter, proceeded to trial. The jury found that Gurland had not waived, and was not otherwise estopped from, asserting his rights under the Agreement, and returned a verdict in favor of Gurland in the amount of $150,000. The judgment was entered on June 10, 2004. This timely appeal of the court's grant of Gurland's motion for partial summary judgment followed.

## DISCUSSION

### I. Case No. 1047

Storetrax asserts that the circuit court erred in granting Gurland's motion for partial summary judgment because genuine disputes of material fact exist as to whether Gurland was terminated "for cause" under the Agreement. Storetrax does not dispute that, at the time Stewart terminated Gurland, she did not inform him that he was being terminated "for cause," or that Gurland was not provided written notice or an opportunity to cure any alleged deficiency prior to his termi-

nation. Rather, according to Storetrax, under sections 6(b)(iv) and 6(b)(vi) of the Agreement, it had no obligation to provide Gurland with notice or an opportunity to cure. Even if the Agreement required that Gurland be provided notice prior to being terminated "for cause," Storetrax claims that Gurland's recovery is limited to the notification period. Finally, because the termination provisions of the Agreement were not exclusive and Gurland's actions materially breached the terms of the Agreement, Storetrax asserts that it was relieved of its contractual obligation, if any, to provide Gurland with notice prior to terminating him.

Gurland maintains that, "in nearly every instance," the Agreement "requires not only 'a material and continuing breach' ... but also 'written notice' to [the] [e]mployee of such material and continuing breach or material failure and failure by the [e]mployee to cure the same within (30) days of such notice." Because he never received written notice, Gurland contends that, under the Agreement, he could not have been terminated "for cause." Alternatively, he asserts that, because Storetrax argued that the contract was no longer in force and, in Stewart's words, "no one at Storetrax thought Mr. Gurland had a [valid] contract," Storetrax's contention that it terminated him "for cause" is "fanciful" and "completely illogical."

Under Maryland Rule 2–501(f), a court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." We review "a trial court's grant of a motion for summary judgment *de novo.*" *Remsburg v. Montgomery,* 376 Md. 568, 579, 831 A.2d 18 (2003). *See also Todd v. Mass Trans. Admin.,* 373 Md. 149, 154, 816 A.2d 930 (2003); *Beyer v. Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707 (2002); *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 443, 795 A.2d 715 (2002). "The trial court will not determine any disputed facts, but rather makes a ruling as a matter of law. The standard of appellate review, therefore, is whether the trial court was

legally correct." *Williams v. Mayor of Baltimore,* 359 Md. 101, 114, 753 A.2d 41 (2000) (internal citations omitted).

When reviewing a grant of summary judgment, we first determine whether a genuine dispute of material fact exists "and only where such dispute is absent will we proceed to review determinations of law." *Remsburg,* 376 Md. at 579, 831 A.2d 18. "In so doing, we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Id.* at 579–80, 831 A.2d 18. "[T]he mere presence of a factual dispute in general will not render summary judgment improper." *Remsburg,* 376 Md. at 579, 831 A.2d 18. As the Court explained in *Lippert v. Jung,* 366 Md. 221, 783 A.2d 206 (2001), "A dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Id.* at 227, 783 A.2d 206 (quoting *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)) (emphasis in *Lippert*).

Here, the Agreement provided that Storetrax could, with a minimum of ten days written notice, terminate Gurland, at any time, with or without cause. Termination became effective upon the date provided by the notice, but no earlier than ten days following the date of the notice of termination. In the event that he was terminated for "cause," as defined by section 6(b), Gurland was entitled to his salary due "through the day on which such termination is effective, in accordance with [Storetrax's] normal payroll policies." If he was terminated "without cause," however, Gurland was entitled to twelve months salary as of the date of termination and any earned bonuses or accrued benefits.

Section 6(b) provides three alternative definitions of "cause" relevant in the instant case. First, section 6(b)(i) defines "cause" as a continuing breach of any covenant or a material failure of performance of Gurland's obligations under the Agreement, following written notice and failure to cure within

thirty days. Second, under section 6(b)(iv), "cause" is defined as the performance of an act or inaction "demonstrating an intentional or reckless disregard of the interests of [Storetrax]." Finally, section 6(b)(vi) defines "cause" as a "repeated and deliberate failure to follow the direction of [Storetrax's] Board of Directors of lawful instructions or actions."

Maryland adheres to the objective law of contract interpretation and construction. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 178, 776 A.2d 645 (2001). Contract interpretation, like statutory interpretation, begins with the plain meaning of the contractual terms. *Fister ex re. Estate of Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001). "The clear and unambiguous language of an agreement will not give way to what a party thought the agreement meant or was intended to mean." *County Comm'rs of Charles County v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 444, 784 A.2d 545 (2001). *See also Kasten Constr. Co., Inc. v. Rod Enters., Inc.*, 268 Md. 318, 329, 301 A.2d 12 (1973). "The construction of contractual language is, in the first instance, 'a question of law for the court to resolve.'" *Lerner Corp. v. Three Winthrop Props., Inc.*, 124 Md.App. 679, 684–85, 723 A.2d 560 (1999) (quoting *Shapiro v. Massengill*, 105 Md.App. 743, 754, 661 A.2d 202 (1995)).

The plain and unambiguous language of section 6 evidences that the definitions of "cause" are mutually exclusive. Moreover, aside from the section 6(b)(i) definition of cause, none of the other definitions requires notice and an opportunity to cure. Gurland was entitled to written notice of termination under section 6(a), but he was entitled to an opportunity to cure only under section 6(b)(i). Upon written notice, Storetrax could have terminated Gurland for cause under sections 6(b)(ii)-(vi) without an opportunity to cure. Therefore, we reject Gurland's contention that he could not have been terminated "for cause" because he was not provided written notice *and* an attendant opportunity to cure any performance deficiency. Although section 6(a) of the Agreement required Storetrax to provide, at a minimum, ten days notice of termi-

nation, Storetrax was not required to state the reason for Gurland's termination for cause and, if terminated "for cause" under sections 6(b)(ii)-(vi), he was not entitled to an opportunity to cure. The lack of notice could reflect on the credibility of Storetrax's assertion that it terminated Gurland for "cause," but does not preclude the argument.

We find *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 706 N.Y.S.2d 724 (2000), instructive. At issue in *Delvecchio* was an employment contract giving the corporate employer the power to terminate the employee with cause, upon a minimum of five days written notice. The corporation was also permitted to terminate the employee without cause, at any time, but was required to pay $250,000 in liquidated damages if it did so. Approximately one year into the five year contract period, the employer terminated the employee without providing written notice. Thereafter, the employee filed a breach of contract claim and asserted a right to recover pursuant to the liquidated damages clause. A trial court later granted the employee's motion for summary judgment, concluding that, because the employee was not provided notice, he was, necessarily, terminated without cause and entitled to recover the $250,000. Reversing the trial court's grant of summary judgment, the New York Supreme Court Appellate Division concluded that there were disputes of fact regarding whether the employee was terminated with or without cause. Moreover, the appellate court opined:

Contrary to the [trial] court's conclusion, the corporate defendants' failure to provide written notice to the [employee] did not, under the circumstances of this case, render the termination for cause ineffective. Although th[e] [employer] may be liable to the [employee] for certain damages for failing to provide notice, th[e] [employer] did not forfeit [its] right to terminate the agreement for cause.... [T]he contract in this case did not afford the [employee] an opportunity to cure and, for the most part, his alleged misfeasance

was not, in any event, curable. Thus, in this case, notice was not a material term of the contract.

*Id.* at 726 (internal citations omitted).

In opposition to Gurland's motion for partial summary judgment, Storetrax attached the affidavits of Stewart and Di Iaconi. Both claimed that Gurland, who was in charge of reinstalling the corporation's computer system following a move to a new office, refused to complete the installation if his demand for an increase in salary was not granted. In addition, Di Iaconi stated that Gurland was asked to take part in "executive management calls on weekends," but she estimated that Gurland "missed over 50% of the regular conference calls that were held, as he was only willing to work a standard 40 hour work week." Furthermore, Di Iaconi asserted that Gurland took credit for drafting an anonymous letter to the Board, which called for Stewart's removal and decried her as incompetent, untrustworthy, and a liar. Viewing the evidence, as we must, in a light most favorable to Storetrax, we are persuaded that there is a genuine dispute of material fact concerning whether Gurland was terminated for "cause" under sections 6(b)(iv) and (vi) of the Agreement.

It is undisputed that Storetrax did not provide Gurland with written notice prior to his termination. However, even if Storetrax breached the Agreement by not providing written notice, so long as it terminated him for "cause" under any of the provisions of section 6(b)(ii)-(vi), Gurland's damages for that breach would be limited to his salary for the duration of the notice period. *See Enterprise Wheel & Car Corp. v. United Steelworkers,* 269 F.2d 327, 331, (4th Cir.1959), *rev'd on other grounds,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("[W]here a contract of employment contains a provision allowing termination after a period of notice has been given[,] ... damages for wrongful discharge are limited to the notice period since at the expiration of the period the right of the employer to discharge the employee is unrestricted."); *Odell v. Humble Oil & Refining Co.,* 201 F.2d 123, 128 (10th Cir.1953) ("Where a contract of employment expressly empowers an employer to terminate the contract upon giving notice,

recovery for wrongful breach is limited to the notice period."); *Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp. 998, 1010 (D.Del.1985) ("[A] ninety day notice provision in a termination clause limits the terminated party's damages to benefits he is entitled to receive under the contract during the notice period."). *See also*, 24 Williston on Contracts §§ 54:48, 66:6 (4th ed. 1990 & Supp. 2005).

 Storetrax also contends that there is a dispute of fact concerning whether Gurland materially breached the terms of the Agreement, thereby relieving Storetrax of its contractual obligations, including the obligation to provide written notice of termination. The Court of Appeals has stated that, "[u]nless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract.' " *Foster–Porter Enters., Inc., v. De Mare*, 198 Md. 20, 36, 81 A.2d 325 (1951) (quoting Williston on Contracts § 842(i) (Rev. ed.) (internal citations omitted)). It is well settled that, regardless of the inclusion of a non-exclusive termination clause in an employment contract, an employer is excused from performance, where the employee materially breaches the contract terms. *See Regal Savings Bank, FSB v. Sachs*, 352 Md. 356, 363, 722 A.2d 377 (1999) ("For the breach of duty by an employee to extinguish the obligation of an employer to pay future compensation under a contract of employment, the breach, even if willful, must be material.").

In *Chai Management, Inc., v. Leibowitz*, 50 Md.App. 504, 439 A.2d 34 (1982), this Court considered "[w]hether an employer who fires an employee for cause (upon a material breach of contract) must be required to pay the employee for the notice period designated by the employment contract[.]" *Id.* at 505, 439 A.2d 34. In that case, Leibowitz was employed by Chai Management pursuant to an employment contract, under which either party could terminate the contract upon providing sixty days notice. Leibowitz was terminated, without notice, for "gross negligence, insubordination, and ...

breach of contract." *Id.* at 506, 439 A.2d 34. Leibowitz thereafter sued Chai Management for breach of contract and sought, as damages, the amount due for the sixty day notice period. The trial court granted Leibowitz's motion for summary judgment.

On appeal, this Court determined that there were triable issues of fact concerning whether Leibowitz had breached the employment contract prior to his termination. We stated:

> Here, because we must accept as true the inference that the employee had breached the contract, we are faced with a situation where a breaching employee is subsequently seeking the benefit of one of the provisions of the contract. It is as if the employee has breached the provision that requires him to go to work and then sues under the provision which specifies his salary. Once an employee has breached the contract, he cannot subsequently force the employer to perform except in unusual circumstances, e.g., if the employee has a vested right to commissions which accrue at a date subsequent to his breach. "There must be compliance with a provision in a contract of employment ... for a stipulated notice of the termination of the employment, and a discharge or abandonment without the required notice is unlawful except where valid grounds authorizing the termination of the employment exist ... A party claiming the benefit of a notice under the contract of employment must show compliance on his part with the terms of the contract." 56 *C.J.S. Master & Servant* § 32(c) (emphasis added) (footnotes omitted).

> "Accordingly, an employee rightfully discharged for incompetency, misconduct, or other reason forfeits the balance of his pay which might have been due him after the fulfillment of the contract." 53 *Am.Jur.2d Master & Servant* § 45 (footnote omitted).

*Id.* at 509, 439 A.2d 34. Thus, we concluded that, if Chai Management could demonstrate that Leibowitz had materially breached the contract, he would not be entitled to compensa-

tion for the sixty day notice period. *Id.* at 513–14, 439 A.2d 34.

As previously explained, the termination provisions in section 6 of the Agreement are mutually exclusive of one another, *i.e.*, upon ten days written notice, Storetrax could terminate Gurland "for cause" under sections 6(b)(ii)-(vi), without providing Gurland with an opportunity to cure. Moreover, the termination provisions found in section 6(b) are not exclusive of the grounds for termination found at contract law generally.[2] *See Tricat Indust., Inc., v. Harper,* 131 Md.App. 89, 114, 748 A.2d 48 (2000) (concluding that "the exclusivity requirement was not met by the Agreement in question," which, among other things, "did not expressly purport to be exclusive"). If the statements alleged in the affidavits submitted by Storetrax in opposition to Gurland's motion for summary judgment were believed, a reasonable finder of fact could conclude that Gurland materially breached the terms of the Agreement, thereby relieving Storetrax of its obligations to provide notice and severance compensation and permitting it to immediately terminate Gurland.

Finally, we consider Gurland's assertion that Storetrax is judicially estopped from arguing that it terminated him "for cause." In support of his argument, Gurland directs our attention to Storetrax's motion for a temporary restraining

---

2. At first glance, section 6(b)(i), which applies to "material continuing breach[es]" and "material failure[s] of performance," would appear to encompass any material breach of the Agreement, thereby requiring Storetrax to provide Gurland with an opportunity to cure before terminating him for such a material breach. That is, of course, unless the material breach was subsumed within sections 6(b)(ii)-(vi). Upon a more careful reading of the contract language, however, we are persuaded that there could be actions that constitute a material breach or failure of performance under the Agreement, which are not continuing. Therefore, the language of section 6(b)(i) only applies to those continuing material breaches and failures of performance that could potentially be cured. Accordingly, if a finder of fact were to conclude that Gurland's actions materially breached the terms of the Agreement and were not continuing, *i.e.*, capable of being cured, those actions, standing alone, could be grounds for termination of the Agreement, thereby relieving Storetrax of all of its contractual obligations, including the obligation to provide written notice of termination.

order staying the writ of garnishment. In that motion, Storetrax alleged the meritorious defense of waiver and claimed that it "did not carry out the formality of terminating [Gurland] for 'cause,' " because it did not believe there continued to be a valid contract.

■ " ' "Judicial estoppel," sometimes known as the "doctrine against inconsistent positions," and "estoppel by admission," prevents "a party who successfully pursued a position in a prior legal proceeding from asserting a contrary position in a later proceeding." ' " *Vogel v. Touhey*, 151 Md.App. 682, 707, 828 A.2d 268 (2003) (quoting *Gordon v. Posner*, 142 Md.App. 399, 424, 790 A.2d 675 (2002)). While there is no "exhaustive formula for determining the applicability of judicial estoppel," the Supreme Court of the United States has articulated several factors courts consider when determining the doctrine's application to a particular case:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir.1999); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir.1982); *United States v. C.I.T. Const. Inc.*, 944 F.2d 253, 259 (5th Cir.1991)) (internal citations omitted).

■ Storetrax's argument that there was no valid contract in seeking to stay the garnishment might appear to be "clearly

inconsistent" with its position that it terminated Gurland for "cause" under the Agreement. But, in arguing that the notice and opportunity to cure provisions of the Agreement were excused, Storetrax is essentially claiming that it was no longer required to comply with the terms of the Agreement because Gurland had materially breached the Agreement. Thus, it was not required to inform Gurland that he was being fired "for cause," because the Agreement was no longer binding. These positions are not clearly inconsistent because Storetrax, in each instance, is claiming that the Agreement was no longer in effect and adherence to its terms was not required. In the event that the Agreement was valid at the time it terminated Gurland, Storetrax asserts that his actions leading to his termination came within the definition of "cause" in sections 6(b)(iv) and (vi) of the Agreement. Those positions are not clearly inconsistent. In any event, Storetrax was not successful in its effort to quash the writ of garnishment. Accordingly, we find the doctrine of judicial estoppel does not apply.

## II. Case No. 418

### A. Choice of Law.

Storetrax contends that the circuit court erred in applying Maryland law, rather than Delaware law, to determine whether Gurland breached his fiduciary duty to the corporation and to assess damages. In support of its argument, Storetrax claims that, pursuant to the "internal affairs doctrine," the law of the state of incorporation, Delaware, should govern the rights and responsibilities of the parties. Citing *Resolution Trust Corp. v. Everhart,* 37 F.3d 151 (4th Cir.1994), and the Restatement (Second) of Conflicts § 309 (1971), Storetrax asserts that the internal affairs doctrine is not absolute, but rather a presumption. According to Storetrax, the circuit court erred in concluding that the presumption was rebutted and that Maryland had more significant relationship to the parties.

In *NAACP v. Golding,* 342 Md. 663, 679 A.2d 554 (1996), the Court of Appeals explained the "internal affairs doctrine" as follows:

"The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands."

*Id.* at 673, 679 A.2d 554 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)). *See also Tomran, Inc. v. Passano*, 159 Md.App. 706, 862 A.2d 453 (2004) (relying upon the internal affairs doctrine in the absence of a contractual choice of law provision to conclude that the law of the country of incorporation controlled a shareholder's derivative suit), *aff'd*, 391 Md. 1, 891 A.2d 336 (2006). The Restatement (Second) of Conflicts § 309 provides, in pertinent part:

The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Section 6 to the parties transaction, in which event the local law of the other state will be applied.

Section 6 sets forth the following principles:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Ostensibly applying the Restatement (Second) of Conflicts §§ 6 and 309, the circuit court determined that Maryland had

a more significant relationship to the parties' transaction. The court concluded, in relevant part:

> Maryland is not merely the state of trial. Although Storetrax is a Delaware corporation, [Storetrax's] principal place of business is in Maryland. [Gurland] resides in Maryland. The alleged breach of contract concerning the severance payment occurred in Maryland. The Court takes further judicial notice that the [Agreement] was to be construed in accordance with Maryland law. The original suit for breach of contract was filed in Maryland and reversed by the Maryland Court of Special Appeals. The alleged breach of fiduciary duty by Mr. Gurland took place in Maryland. In short, both [Storetrax] and [Gurland] had all contacts and a more significant relationship with the State of Maryland.

Although it contends that the circuit court erred in applying the substantive law of Maryland rather than Delaware, other than asserting that Delaware "has a more developed body of law," [3] Storetrax does not elucidate on the differences between the laws of the two jurisdictions. In its brief Storetrax stated:

> It appears that the substantive law of Maryland and Delaware with regard to the affirmative obligations and duties of a director to protect the corporation are the same. The finding of a breach of the duty itself would not appear to vary whether Maryland or Delaware law is applied. However, Delaware law has a well-developed body of law dealing with damages which flow from the breach of a director's fiduciary duty to the corporation, which Maryland does not. Thus, the importance of the issue.

Storetrax clarified its position in its reply brief, explaining: "Delaware has an extensive and rich body of case law dealing with the fiduciary obligations of a director. Maryland has far

---

3. According to Storetrax,

It is believed that if Maryland law applies, the decision whether to grant attorneys['] fees as substantive damages will be a case of first impression and the outcome far from certain. Delaware on the other hand has a more developed body of law[,] [which affords the "Chancery Cour[t] 'broad discretion to tailor remedies[,]' " including attorneys' fees and litigation expenses].

less. No close analysis or comparison of individual cases has been undertaken."

Because Gurland was alleged to have breached his fiduciary duty to his corporation, "a matter peculiar to the relationships among and between the corporation and its ... directors," we are persuaded that, pursuant to the internal affairs doctrine, Delaware law more appropriately applied to the present dispute. Storetrax, however, has failed to establish that it was prejudiced by any erroneous choice of law. *See Crane v. Dunn*, 382 Md. 83, 91, 854 A.2d 1180 (2004) ("It is the policy of [the appellate courts] not to reverse for harmless error and the burden is on the appellant in all cases to show prejudice as well as error. Prejudice will be found if a showing is made that the error was likely to have affected the verdict below.") (internal citations omitted). *See also State Deposit Ins. Fund Corp. v. Billman*, 321 Md. 3, 17, 580 A.2d 1044 (1990) ("It is not the possibility, but the probability, of prejudice which is the object of appellant inquiry."). We have concluded, and Storetrax has conceded, that the relevant substantive law of Delaware and Maryland is the same. We do not reach the issue of damages because, as we explain below in Part II B, Gurland did not breach his fiduciary duty owed to the corporation under either state's law. Therefore, any alleged error was harmless.

## B. Breach of Fiduciary Duties.

Storetrax contends that Gurland, a member of the corporation's Board of Directors, had a fiduciary duty to place the corporation's interests ahead of his own. According to Storetrax, by filing a lawsuit against the corporation when he knew that it could not pay its debts in the ordinary course of business, obtaining a summary judgment by default, and subsequently, garnishing the corporation's bank account, Gurland breached his fiduciary duties to the corporation. Storetrax claims, "[i]t is not the filing of the lawsuit that violated Gurland's fiduciary duty, it was his failure to resolve his conflict, his silence in the face of Storetrax's obvious ignorance of ... [Case I], and his actions thereafter that violate his

fiduciary duty as a director to the corporation." Moreover, Storetrax asserts that Gurland's breach was continuing because he did not lift the summary judgment by default and the garnishment when the corporation requested that he do so.

Maryland Rule 8–131(c) governs appellate review of actions tried without a jury, and it provides, in pertinent part:

[T]he appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Similarly, for mixed questions of law and fact, "we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law." *Brown & Sturm v. Frederick Road Ltd. P'ship*, 137 Md.App. 150, 170, 768 A.2d 62 (2001) (citing *Bowers v. Eastern Aluminum Corp.*, 240 Md. 625, 626–27, 214 A.2d 924 (1965)). With regard to questions of law, however, the trial court "enjoys no deferential appellate review," and the appellate court "must apply the law as it discerns it to be." *Helinski v. Harford Memorial Hosp., Inc.*, 376 Md. 606, 614, 831 A.2d 40 (2003) (citing *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990)).

It appears that the issue of whether a corporate director breaches his or her fiduciary duties by failing to affirmatively notify his or her corporation after filing a complaint against it is a matter of first impression in both Delaware and Maryland. The issue of whether it is a continuing breach of a corporate director's fiduciary duty to decline to lift a default judgment or writ of garnishment, despite requests by the corporation to do so, also appears to be a matter of first impression in both jurisdictions.

 In deciding the issue, however, we are guided by settled statutory and case law regarding a corporate director's fiduciary obligations generally. In both Delaware and Maryland, a member of a corporation's Board of Directors stands in

a fiduciary relationship with both the corporation and the corporation's shareholders. *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve."); *Booth v. Robinson,* 55 Md. 419, 436–37 (1881); *Wittman v. Crooke,* 120 Md.App. 369, 707 A.2d 422 (1998). Included among a director's fiduciary obligations are the duties of due care, good faith, and loyalty. *Malone,* 722 A.2d at 10; Maryland Code (1975, 1999 Repl. Vol.), § 2–405.1 of the Corporations and Associations Article ("C. & A.") (providing that a director shall perform his duties "in good faith[,]" "[i]n a manner he reasonably believes to be in the best interests. of the corporation[,]" and "[w]ith the care that an ordinary prudent person in like position would use under similar circumstances.").

Describing a director's fiduciary duties, in *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939), the Supreme Court of Delaware explained:

> While technically not trustees, [corporate directors] stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

The Court of Appeals has likewise iterated:

"Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A [corporate director] is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions ... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

*Della Ratta v. Larkin,* 382 Md. 553, 578, 856 A.2d 643 (2004) (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928)).

▆▆ Despite a corporate director's exacting adherence to his fiduciary responsibilities, circumstances can arise when the director's interests may conflict with the interests of the corporation. When such conflicts materialize, the director has a responsibility to notify the corporation, either through its directors or shareholders. For example, where the director has an interest in a transaction presented to the corporation for consideration, he can find "safe harbor" by disclosing the conflict to the corporation and abstaining from the ratification of that transaction. *See* Del.Code Ann. tit. 8 § 144 (1953 & Supp. 2005) (providing that a transaction or contract between an interested director and the corporation will not be set aside solely because of the director's interest, where, among other things, the director discloses his relationship or interest and the transaction is ratified by the affirmative votes of a majority of disinterested directors); C. & A. § 2–419(a)–(b) (same). *See also, e.g., Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345 (Del.1993); *Shapiro v. Greenfield,* 136 Md.App. 1, 764 A.2d 270 (2000).

▆▆ Gurland's claim for severance pay was clearly hostile to the interests of Storetrax. But, analogizing to the statutory and common law on interested director transactions, we are

persuaded that Gurland could find "safe harbor" by putting Storetrax on notice of his claim and not taking part in the Board's deliberations regarding his claim.

Clearly, Gurland's November 30 and December 11 letters to Stewart and the Board, respectively, put the Board on notice that he believed that the Agreement was valid and that he was entitled to severance pay under its terms. Moreover, in his December 11 letter, Gurland stated: "If the issue remains unresolved as of December 21, 2001[,] *I will* instruct my attorney to proceed." (Emphasis added).

It is also clear from the letter dated December 20, 2001, that "the senior management of Storetrax and the Board of Directors (excepting [Gurland])" were aware of Gurland's pending claim. Furthermore, it is clear from that letter that management and the Board were in agreement that Gurland was not entitled to severance pay and were willing to litigate the matter in the event that Gurland decided to proceed. The December 20 letter also indicated that Storetrax had retained the assistance of counsel.

The trial court was neither clearly erroneous in its determination that Gurland acted in good faith in informing the corporation of his intention to file suit nor erroneous as a matter of law in concluding that his December 11 letter to the Board put the corporation on sufficient notice of his intent to file suit for breach of contract. In fact, Gurland waited for more than one month after sending the letter prior to filing his complaint. We fail to see how Storetrax was not made aware that Gurland intended to litigate the matter. Accordingly, we conclude that Gurland did not violate, as a matter of law, his fiduciary duties to Storetrax by filing a complaint for breach of contract after he provided the corporation with written notice of his complaint.

Because Gurland provided such notice, we are persuaded that the cases relied upon by Storetrax, including *Marr v. Marr,* 73 N.J. Eq. 643, 70 A. 375 (Err. & App.1908) and *Union Ice Co. v. Hulton,* 291 Pa. 416, 140 A. 514 (1928), are distinguishable from the case at bar. In *Marr,* a director and

president of a closely held corporation, William Marr, loaned funds to the corporation. Ultimately, he became the corporation's sole creditor. At the final shareholders meeting, Marr informed the shareholders that "unless a sale of the property of the company could be effected, [he] would put his claims into judgment and sell the property." 70 A. at 378. Although the corporation owned real and personal property valued at $25,000, the corporation's organizational structure had been abandoned. Eight months after the final shareholders meeting and fifteen months after the final directors meeting, without additional notice to any of the corporate directors, officers, or shareholders, other than service of process upon "some agent of the company," Marr filed suit against the corporation, alleging that he was owed $8,500 for the outstanding loans. *Id.* at 379. He secured a judgment in the amount of $10,287.90 and thereafter executed the judgment through a sheriff's sale. Without notice of the sheriff's sale, other than to the other directors, officers, or shareholders, Marr was the only purchaser present at the sale. In satisfaction of his judgment, Marr purchased all of the real and personal property of the corporation for one-half of its value. *Id.* 376.

Seven years after the sheriff's sale, a guardian acting on behalf of a minor shareholder filed suit against Marr and the corporation seeking to set aside the sheriff's sale and alleging that, as a "trustee for the stockholders of the company," Marr was obliged to protect their interests and "give them fair notice that the execution sale was in contemplation." *Id.* at 377. The trial court held that notice, other than the statutory notice provided, was not required because Marr had attempted to get the shareholders to raise the funds to pay off its debt and that "it would have been futile to give such notice." *Id.*

The Court of Errors and Appeals of New Jersey determined that, in instances where a director becomes a creditor and assumes a position antagonistic to his or her corporation, he or she may bring an action against the corporation to recover the debt owed. *Id.* at 378. In so doing, however, the *Marr* Court opined that the director "must, on taking legal proceedings for collection of his [or her] debt, relinquish his trust *pro hac vice,*

not covertly, but openly, and with fair notice to his [or her] company." *Id.* To satisfy his or her duty, the director should notify either the other directors or the shareholders, depending upon the circumstances. The *Marr* Court further reasoned: "If the company is equipped with other officers and directors who are actively representing the interests of the stockholders, it may well be that notice to such officers and directors be deemed sufficient." *Id.* The *Marr* Court determined that the "general notice" Marr provided nearly ten months before the sheriff's sale and notice that could be inferred from service of process upon "some agent of the company," was insufficient to fairly apprise the shareholders of the imminent sale of the corporation's property. *Id.* at 379. The Court concluded that the complainant was entitled either to affirm the sale and treat Marr as a trustee for the complainant or insist that the sale be set aside. *Id.* at 380.

The Supreme Court of Pennsylvania contemplated a similar set of circumstances in *Union Ice*. In that case, the president of a corporation, Huton, loaned the corporation funds. Prior to filing a lawsuit against the corporation, Huton's attorney, who was also the vice president of the corporation, orally informed the board of directors that, at some point in the future, Huton would "have to reduce his notes to judgment, and that eventually he would have to sell the property." 140 A. at 514. Without providing additional notice, Huton filed suit, obtained a judgment, and executed the judgment by means of a sheriff's sale, where he allegedly purchased the corporation's property at less than fair market value. *Id.* The corporation filed an action for an accounting, in which it sought a determination of the fair market value of the property. Finding that Huton failed to notify the directors or stockholders of his intention to execute the judgment, the trial court granted the corporation relief.

On appeal, Huton argued that the notice provided by his attorney was sufficient. Alternatively, he claimed that he was not required to provide notice of the execution and sale because, "when he began legal proceedings to reduce his claim to judgment, that was notice of all the consequences that

might result from such proceedings, including notice that the property of the company would be sold after judgment if it was not paid." *Id.* at 515. Concluding that the oral notice provided by Huton's attorney was deficient, the Supreme Court of Pennsylvania explained that the board of directors "were entitled to know when the execution issued, and the time and place of the sale in order that they might take steps to protect the interests of the stockholders for whom they and [Huton] were trustees." *Id.* According to the court, Huton's notice was "vague and indefinite, only indicating a possible future intention." *Id.* at 514. With regard to Huton's second contention, the *Union Ice* Court explained that, surely in enforcing a judgment against his or her corporation, a director or officer was entitled to utilize "the same methods as are open to other creditors." *Id.* at 515. When doing so, howeverer, the corporate officer or director "must take no unfair advantage" and "be scrupulous to see that some one on the corporation's behalf knows what is being done so that its interests may be safeguarded." *Id.* The court affirmed the trial court's order of an accounting.

Here, unlike in *Marr* and *Union Ice,* Gurland provided written notice of his intent to file a lawsuit against the corporation to the Board, which was actively involved in the corporation's activities. The notice set forth a date for the commencement of the proceeding, stating definitively that Gurland would instruct his attorney to proceed if the matter was not resolved within ten days. Moreover, in filing the complaint, Gurland complied with Maryland Rule 2–124(d), which provides that when serving a corporation service may be made upon its resident agent.[4] As a litigant represented

---

4. Rule 2–124 provides, in pertinent part:

 (d) **Corporation.** Service is made upon a corporation, incorporated association, or joint stock company by serving its resident agent, president, secretary, or treasurer. If the corporation, incorporated association, or joint stock company has no resident agent or if a good faith attempt to serve the resident agent, president, secretary, or treasurer has failed, service may be made by serving the manager, any director, vice president, assistant secretary, assistant treasurer, or

by counsel, direct disclosures to the corporation, which was also represented by counsel, concerning the matter under dispute would have been inappropriate and not required under any statute or case law this Court could locate.

When Gurland became a creditor of the corporation, he had the same rights to collect as any other judgment creditor. To adopt Storetrax's argument that Gurland had a continuing fiduciary obligation to lift the garnishment upon its request would put Gurland in the illogical and unjust position of being able to collect on the judgment only with Storetrax's consent. *See Waterfall Farm Sys., Inc., v. Craig*, 914 F.Supp. 1213, 1228 (D.Md.1995) (holding, among other things, that "the mere fact that the [appellees] were officers and directors of [the corporation] did not impose on them a legal obligation to accede to demands of the [c]orporation which were adverse to their own personal financial interests"). Declining to lift the garnishment was not a continuing breach of Gurland's fiduciary duty.

### C. Admissibility of Hearsay Statements.

Finally, Storetrax contends that the circuit court erred in excluding Gurland's alleged statements to Wurtzel that he would "get back" to Wurtzel on Storetrax's alleged settlement offer. On appeal, Storetrax asserts:

Had Mr. Gurland been allowed to testify as to those discussions he would have confirmed the fact that he had a telephone conference in January of 2002 with Mr. Wurtzel and he had represented to Mr. Wurtzel that he would get back to him about a settlement offer that had been made by Storetrax.

Under the Maryland Rules, the discovery process is controlled largely by the parties, with "judicial intervention in the discovery process [being] the exception rather than the rule." John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland*

---

other person expressly or impliedly authorized to receive service of process.

*Civil Procedure* § 7.8, 7–126 (2d ed. 2004). Maryland Rules 2–432 and 2–433 provide the parties with a means of seeking judicial intervention for discovery disputes arising prior to trial and provide the court with a means of enforcing discovery orders. Where a party ignores a court order compelling discovery, the court may sanction that party by, among other things, striking pleadings, entering a default judgment, or precluding the party from introducing into evidence matters subject to the discovery order. Md. Rule 2–433(a).

██ In fashioning a remedy for discovery violations, trial courts are afforded broad discretion. *North River Ins. Co. v. Mayor of Baltimore*, 343 Md. 34, 47, 680 A.2d 480 (1996) ("We fully recognize that ruling on discovery disputes, determining whether sanctions should be imposed, and if so, determining what sanction is appropriate, involve a broad discretion that is to be exercised by the trial courts."); *Bartholomee v. Casey*, 103 Md.App. 34, 48, 651 A.2d 908 (1995). In *Taliaferro v. State*, 295 Md. 376, 456 A.2d 29 (1983), the Court of Appeals said that, in exercising its discretion, the trial court should consider

> whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering or opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.

*Id.* at 391, 456 A.2d 29. *See also Heineman v. Bright*, 124 Md.App. 1, 720 A.2d 1182 (1998), *cert. denied*, 344 Md. 116, 685 A.2d 451 (1996), (characterizing the factors set-forth in *Taliaferro* as mandatory). Because "[f]requently these factors overlap[,] [t]hey do not lend themselves to compartmental analysis." *Taliaferro*, 295 Md. at 391, 456 A.2d 29.

██ When a discovery violation becomes apparent only after the trial has commenced, the potential for prejudice is greater than if the discovery violation had occurred prior to trial. As this Court opined in *Bartholomee:*

When a party's failure to supply information properly requested in an interrogatory becomes apparent early in the case, any injury to the opponent can be easily remedied by an order compelling disclosure. On the eve of trial, however, "the injury inherent in failure to make discovery is unfair surprise. It would seem that the only effective cure for this disease is preclusion of the material withheld."

103 Md.App. at 48, 651 A.2d 908 (quoting John A. Lynch & Richard W. Bourne, *Maryland Civil Procedure*, § 7.8(c), at 597 (1993) [hereinafter "Lynch & Bourne"]) (internal citations omitted).

■ During pre-trial discovery, Gurland propounded interrogatories to Storetrax. The following represents relevant portions of the interrogatories Gurland posed to Storetrax and Storetrax's responses:

Q–7. If you intend to use or rely upon in any manner, at any trial or hearing in this case, any oral or written statement made by Joshua Gurland (hereinafter referred to as "assertion"), state the date of the assertion, the manner in which the assertion was made, the person to who the assertion was made and the content of the assertion and identify all witnesses to the assertion.

*Answer:* Objection. It is not appropriate to inquire as to what statements, either oral or written, counsel intends to use or rely upon in any manner at a trial of this case, as that is the work product of counsel. *Nonetheless, documents will be turned over to Gurland and his counsel, many of which will be directly relevant to statements made by him concerning the various issues in this case.*

Q–8. If you intend to use or rely upon in any manner, at any trial or hearing in this case, any other oral or written statement, state the date of the assertion, the manner in which the assertion was made and the content of the assertion and identify the person(s) who made said assertion and identify all witnesses to the assertion.

*Answer:* Objection. See answer to question 7.

(Emphasis added.)

When Storetrax sought to elicit Gurland's alleged statement to Wurtzel at trial, Gurland objected, asserting that the statement had not been disclosed prior to trial, despite Storetrax's interrogatory response that such statements would be "turned over." The following colloquy occurred:

[Counsel for Storetrax]: Yes. Well, the objection, Your Honor is one, and I will tell you, I never answer a question that starts off, "if you intend to use a-[.]"

[The Court]: Well, I don't care whether you do or don't. That's not for you to decide. That's for me to do.

[Counsel for Storetrax]: I agree, Your Honor. And if this were on a proper motion to compel, I would pull out my case law and-

[The Court]: All right. But his answer, and that's what I said, you didn't do anything.

[Counsel for Storetrax]: Exactly.

[The Court]: And then [Gurland] turns around and says, now wait a minute. It's true I didn't do anything, but he promised that documents will be turned over.

[Counsel for Gurland]: And the statements.

[The Court]: Many of which will be directly relevant statements made by him and then he didn't do it. And I have a right to rely on that.

[Counsel for Storetrax]: I did turn over every document we have. I don't have any documents evidencing this. All I had is the oral testimony, what he's going to tell us and what Mr. Wurtzel would tell us if he were called.

\* \* \*

[The Court]: The issue is, his question was, if you intend to use or rely upon in any manner at trial, any oral statement, state the date of the assertion, the manner in which it was made, the content and identify the person. It's the old admission against interest. If you're going to use an admission against interest, I want to know about it.

[Counsel for Storetrax]: I'm not.

[The Court]: Well, I characterized it, his is broader than an admission against interest. It doesn't, it's not qualified to that. . . .

\* \* \*

[Counsel for Storetrax]: I'll proffer what I believe all I was going to use it for. I believe that based upon the exchange of letters, which we see and need say no more, in his discussions he realized that there was an intent on the part of the company to defend a lawsuit if he filed it. That's all it is. Nothing more. Nothing less.

\* \* \*

[Counsel for Storetrax]: I'm sorry, Your Honor. If you perceive that my exchange of letters or anything we did has anything to do with question 7 or 8, I just don't perceive it that way. I never heard one word about question 7 or 8 or anything thereafter and I don't perceive that what I'm asking him goes to—

[The Court]: But you told him you'd give it to him.

[Counsel for Storetrax]: No, Your Honor. I did not.

\* \* \*

[Counsel for Storetrax]: I told him I would give him anything that as, as I think you have properly qualified it or characterized it, an admission against interest. I don't perceive that what he's being asked to do here, which is simply describe as he's going to describe throughout, is what he did or did not do and who he discussed things with.

[The Court]: That's it to his question is broader than an admission against interest. Well, you all are forcing me to rule on an objection. Sustained.

 Initially, we recognize that " '[a] party seeking discovery may not expect his opponent to construe discovery requests as broadly as possible, in essence, to volunteer information beyond the request, on pain of preclusion of evidence at trial as a discovery sanction.' " *Bartholomee,* 103 Md.App. at 49, 651 A.2d 908 (quoting Lynch & Borne). Clearly, a state-

ment from Gurland that he would consider Storetrax's settlement offer and "get back" to Wurtzel would be subsumed in interrogatory seven, even reading the question conservatively. With that said, we are not persuaded that the circuit court's sanction in precluding cross-examination of Gurland on his alleged conversation with Wurtzel constituted an abuse of discretion. We explain.

■■■ Counsel for Storetrax objected to interrogatories seven and eight, claiming that they called for attorney opinion work product. As clarified in *Blair v. State*, 130 Md.App. 571, 747 A.2d 702 (2000), there are two types of attorney work product: "fact and opinion." *Id.* at 607, 747 A.2d 702. "Opinion work product concerns the attorney's mental processes," such as the lawyer's strategies, theories, and mental impressions. *Id.*

Here, although interrogatories seven and eight called for material that Storetrax "intend[ed] to rely upon at trial," we are not persuaded that the information requested consisted of attorney opinion work product. *See Barnes v. Lednum*, 197 Md. 398, 407, 79 A.2d 520 (1951) ("Modern discovery statutes or rules are intended to facilitate discovery, not to stimulate the ingenuity of lawyers and judges to make pursuit of discovery an obstacle race."); *Laws v. Thompson*, 78 Md.App. 665, 689, 554 A.2d 1264 (1989) ("The Maryland discovery rules were deliberately designed to be broad and comprehensive; their purpose is to assure that no party go to trial in a confused or muddled state of mind regarding the facts giving rise to the litigation."). The appendix to the Maryland Rules includes form interrogatories "to facilitate the exchange of meaningful information with a minimum of controversy." Md. Rules app. form interrogatories comm. note. "Standard General Interrogatory No. 3" provides:

3. If you intend to rely upon any documents or other tangible things to support a position that you have taken or intend to take in the action, including any claim for damages, provide a brief description, by category and location,

of all such documents and other tangible things, and identify all persons having possession, custody, or control of them. Md. Rules app. form 3. general interrogatories (emphasis omitted). Clearly, interrogatories such as those propounded by Gurland should not be construed as a request for attorney opinion work product.

Moreover, in responding to Gurland's interrogatories, after objecting, counsel for Storetrax stated that information relevant to the request would be forthcoming. Gurland did not seek an order compelling discovery under Maryland Rule 2–432(b)(D), but given Storetrax's response to interrogatories seven and eight, it was not unreasonable for Gurland to believe that Storetrax's response was complete and that it would provide all relevant information in its possession. Otherwise, litigants could lull an opponent into a false sense of security with an equivocal reply to interrogatories, and defend their actions by arguing that their opponent should have filed a response to compel. Although they are not officially part of the Maryland Rules, the Discovery Guidelines of the Maryland State Bar Association apparently recognize this tactic and attempt to restrict it. Discovery Guideline 5(b) provides that "[t]he practice of objecting to an interrogatory or a part thereof while simultaneously providing a partial or incomplete answer to the objectionable part is presumptively improper." *See also Maged v. Yellow Cab. Co.*, 237 Md. 340, 346, 206 A.2d 257 (1965) ("[W]e should not be understood as approving the practice of answering interrogatories in an evasive manner and then producing evidence to the contrary at the time of trial.").

Upon Gurland's objection, Storetrax did not contend at trial, as it does now, that Gurland's conversation with Wurtzel was being offered to demonstrate that Storetrax "was not on notice of the immediacy of any lawsuit." Instead, Storetrax proffered that Gurland was on notice of Storetrax's intent to litigate any future claim he may file against it. *See Sutton v. State*, 139 Md.App. 412, 452, 776 A.2d 47 (2001) ("Where evidence is excluded, a proffer of substance and relevance must be made in order to preserve the issue for appeal.")

(citing *Conyers v. State*, 354 Md. 132, 164, 729 A.2d 910 (1999)). At trial, Storetrax's letter to Gurland dated December 20, 2001, clearly indicates the company's intent to defend Gurland's breach of contract claim. Therefore, in fashioning the sanction for Storetrax's discovery violation, the circuit court obviously did not perceive that Storetrax would be prejudiced by limiting Storetrax's cross-examination of Gurland. On appeal, Storetrax concedes as much, stating: "Although it is doubtful [this issue] led to the erroneous opinion of the court, Storetrax . . . included this issue should the case be remanded for trial." In addition, had Storetrax sought to elicit the contents of any conversation between Gurland and Wurtzel, it could have called Wurtzel to testify, a witness under its control, but it did not. For the reasons stated above, the circuit court did not abuse its discretion in limiting Storetrax's cross-examination of Gurland as a sanction for providing an incomplete response to interrogatory seven.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN CASE NO. 1047 REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS IN CASE NO. 1047 TO BE PAID BY APPELLEE.**

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN CASE NO. 418 AFFIRMED.**

**COSTS IN CASE NO. 418 TO BE PAID BY APPELLANT.**